Mr. Kushner. Would the court prefer that I have my mask on or off? I think it's fine if you take it off. May it please the court. My name is Jordan Kushner and I represent the impellent Omar Taylor. I'm first going to discuss the meaning of sex act, or in this statute, commercial sex act. And that was the main counts that Mr. Taylor was charged with and convicted of involve trafficking for the purpose of engaging in a commercial sex act. And the statute does not define what commercial sex act is other than to say it's a sex act. And so it comes down to what's the meaning of sex act. And that was critical in this case because the judge specifically instructed the jury that a happy ending massage is a commercial sex act. And the government's theory was based on Mr. Taylor arranging massages that involved what was called a happy ending, which is digital masturbation, basically. Now this is a term that's subject to different interpretations or different definitions. And under the rule of lenity, it's required that this term be strictly construed in favor of the defendant. And it's not at all a given that this particular activity meets the definition of sex act. Under Chapter 109A, which involves another set of statutes involving sexual exploitation, it's clear under those definitions that this kind of activity would not be considered a sex act. It involves penetration. It basically requires penetration in order for it to be a sex act under that chapter. Why do you think we would use that definition from the 109 section? Well, I think because that is a statute. As you said, it's a different set of statutes. It is. But it's a statute that does provide a definition. But the definition starts with, as used in this chapter. So aren't they instructing us at that point to only use it in this chapter?  But what I'm saying is that given the ambiguity of this term, that that's one place that we can look for guidance to say that it's not obvious that a happy ending massage would be a sex act because there's another statutory scheme that wouldn't define it as a sex act. Why not just look for a natural definition of a sex act? And I think we can do that, too. And we get different definitions. Wouldn't this qualify as a sex act under a natural understanding? I guess I think that's open to debate. That's the problem here. So there are unpublished Ninth Circuit cases cited two dictionary definitions that were very broad and included anything that involved sexual gratification. But my brief cites three other dictionary definitions that limit sex act to intercourse or copulation. And so if you were to do a survey based on the survey of dictionary definitions that we did or that have been done, there are different definitions of what constitutes sex act. And under some of the definitions, this would not fall into it. And in some of the definitions, it would. And that's where it becomes fundamentally unfair to a defendant who's charged with a serious crime, where they're put in a position of having to guess what a sex act is. And the problem is under the really broad definition of sex act, you know, a kiss or a touch, you know, that's not to the generals could also be defined as a sex act. And I think clearly that wouldn't. I think we would agree that those aren't things that should put someone away for 15, 30, Mr. Taylor's case, 33 years. Counsel, I want to ask you. So you're right. We did a survey of a number of dictionaries. And Black's Law actually has one of the broader definitions, one of the narrower definitions, excuse me, of sexual intercourse as any sex act or sex act. But when you look at actually when you look at newspaper articles and you look at magazines and you look at contemporary sources, the answer is very different. When you look at what any sex act means, it's almost unanimous in reading newspapers and stuff that that refers to things like what happened here, the happy ending massage. So when we're talking about a natural definition, isn't the most natural definition then how people use it in common language, which seems to encompass what happened here? And that's interesting. I didn't do surveys of newspaper magazine articles, so I don't doubt what the court found when it read different magazines and newspaper articles. I don't know how the problem is. This is a criminal law here, so I don't know how you do it. How do you quantify it? And I don't think you can determine a definition of something that constitutes serious crime based on what someone might look at, see in various newspapers and magazines. Actually, there's an emerging field in legal and linguistics where you talk about corpus linguistics, where you look at the grouping of contemporary sources and contemporary with whatever time the statute was passed and figure out what the plain meaning here is. And again, if you look at the way it's used commonly, it seems to encompass this. And again, I don't doubt that that's what the court found, but is there any statistical study as to what indicating how people define sex act? I just don't think so. And because the ambiguity is out there, again, this is a criminal statute, and there are all kinds of terms under criminal statutes where the criminal statute is defined and the definition ends up being different than what someone in common sense might think it is. But in this particular case, there isn't a specific definition, but there are many different ways of trying to figure out what this term means. And so one is, well, maybe there have been newspaper articles that talk about massage parlors, and they regard that kind of activity as a sex act. But that's being defined pretty broadly. And in the legal realm, there's a big difference. There's a substantial difference, say, between a sex act and sexual contact. So under Chapter 109, there's a lengthy definition of sex act and a lengthy definition of sexual contact. And that's similar in the state statutes as well, where sex act and sexual contact are defined differently. And so if you have a newspaper article, they're not going to distinguish between sex act, sexual act, and sexual contact. It's going to naturally be used more broadly because they're trying to provide general information about what's going on. They're not analyzing whether something constitutes a criminal offense. What about the word any? I think I know what I think of it, but I want to know what you think of the word any, because it does, there is some case law in the circuit that suggests that's the broadest, or, you know, suggests that whatever it's modifying, it's the broadest extent of whatever it's modifying. Which was that? Any, the word any. Any. Any sex act. Any sex act. Any sex act. Yeah. Yeah, I mean, any is broad, but sex act isn't necessarily broad. But if you look at the, like, if you look at dictionaries, you'll find that kind of the most common definition of just general English dictionaries is that it comes up with any sexual action or activity, especially sexual intercourse, right? So they usually modify it by saying usually pointing towards sexual intercourse, but not limiting you to that. So now we have any in front of sex act, and we have all kinds of case law in the circuit that says we should interpret that as broadly as possible. Why would that be wrong? Is the rule of lenity, is that really, at the heart of it, that's the deal, is where you're at? I think the rule of lenity is at the heart of it. Because there's different dictionary definitions and there's different statutory definitions, I think that's the point here is that someone doesn't have adequate notice that anything that, you know, could be sexual in nature, you know, even, again, let's say even a kiss or a touch on a non-intimate part, that could be sexual. And where do we draw the line? And it's just not appropriate for a serious criminal felony offense to make some kind of basically, you know, kind of arbitrary decision about where that line is drawn. I think everyone can agree that intercourse is a sex act. So if that was the basis for Mr. Jeller's charge, then you would have intercourse, you know, that would be a sex act. But beyond that, given the lack of definition, even if it says any sex act, the problem is that sex act itself isn't defined. So it doesn't say anything of a sexual nature. It says sex act. It doesn't say any sexual act or sexual contact. It says sex act. Do you have a particular problem with the use of the term happy endings as opposed to, I mean, looking around at jury instructions around the country, it looks like happy endings appears all over the place in the Ninth Circuit for obvious reasons. They have a case that says it's covered. But there's a lot of other places that when they define sex acts, they will use language in the instructions that say things like any hand to genital contact for the purposes of sexual gratification. And so there's part of me that's wondering whether use of the term happy endings, mainly given the evidence here, may direct, you know, a verdict as opposed to something like, you know, hand to genital contact for purposes of sexual gratification, which leaves it more in the discretion of the finder of fact. Do you see that as problematic or not? Yeah, I mean, one of my, that was the second issue that I raised, was that it was inappropriate for the court, district court, to directly instruct the jury that a happy ending constituted a sex act. And I think the court's come up with, kind of expounded on some of the argument that I was making, and I'm glad that it's articulated in that fashion. So there was one witness that talked about, indicated a happy ending was something other than the masseuse actually touching the person and involved the person actually masturbating. And, you know, a happy ending is broad. It basically means that someone ends up being gratified at the end, but they could be, I think the court makes an important, raises an important issue here, that someone could be gratified without actually, without actual sexual contact or sexual act by the person who's doing the massage. So I do agree that the happy ending, no matter how you look at it, is it was very overbroad as a jury instruction, and sex act should have been defined, you know, for purposes of the law, sex act should have been defined in some kind of clinical legal terminology that left the jury to figure out, you know, to figure out based on legal definitions and not colloquialism, some kind of colloquialism or I guess kind of term of the trade, so to speak. What about oral sex? That seems to be somewhere in between. Is that any sex act in your view? I'm just trying to figure out what rule we're supposed to write. Well, I think under Rule 109, I think under Chapter 109A, oral sex is included as a sex act. And I don't feel I need to argue that because, you know, that's not what Mr. Taylor was accused of procuring. So I guess I don't, I wouldn't argue that at this point. I don't think it's necessary to argue that oral sex is not a sex act. Okay. Can I take you a different direction, a different issue that you raised? You challenged Count 4 with respect to AL, sufficiency of the evidence of fraud, coercion, and force. Right. I noticed you didn't challenge that with respect to Count 2, SN. Is that right? Yeah, I did not raise that. That's correct. So you concede that the evidence of fraud, coercion was sufficient with respect to SN. Yeah, I mean, we don't concede it happened, but we concede that her testimony, I guess I'd have to concede that her testimony, if you were to believe all her testimony, that they could have supported that, could have supported that allegation. But AL, not so much. What's, why is it insufficient with respect to AL? I think the government argues that it was fraud because he said he had a legitimate business at the beginning. Yeah, I mean, she, you know, AL, I don't think her testimony did not come out being that specific. You know, she heard about massages, about the massages. She arranged, you know, to perform the massages at Mr. Taylor's house. There was no allegation that he asked her to engage in any kind of sexual contact of any sort. She talked about some customers asking for it, but she didn't say that Mr. Taylor pressured her to do it, and at some point he advised her to just move the person's hand if they put it in an appropriate place. And so there was no, there wasn't evidence that Mr. Taylor was, you know, was somehow arranging this to happen with the customers. And I guess the big issue here is the government said, well, he put ads for her, but, you know, I think she said she did her own ads. And, you know, the government never produced, never produced evidence of her ads. They did produce evidence of other ads that Mr. Taylor allegedly took out on social media, but there was no, or on Backpage, but there was no evidence of any ad tied specifically to AL. So in the absence of that, there wasn't evidence to show that he was arranging for her to do sex trafficking or fooled her into it. And so, you know, it says someone can speculate or be suspicious, but there wasn't the kind of solid evidence that would be required for a criminal conviction to decide that there was proof beyond a reasonable doubt. Wasn't there evidence, though, and I understand your argument, but there's evidence saying something along the lines of, I think she said this, that he told me he wasn't going to, that sex acts weren't required, that that's not part of the job. And then can't the jury infer from the totality of the testimony of, including hers, but others as well, that, in fact, it was part of the job, and so that there was some element of fraud there? Well, I think there was testimony that there were people there who were working voluntarily and doing legitimate massages. So I don't think from the, again, I think there's, someone could, you know, it's possible it could be the case, but I don't think you could argue it was proven that that's the case, or even based on the evidence that's in the record that a jury could conclude beyond a reasonable doubt that that was the case. Also, I want to reserve some time to rebuttal, but I think it's, you know, the rape, there's a lot of bad act evidence that's challenged, but in particular the allegation by R.T. that she was raped, and she said it was on her 18th birthday, and based on the time frame she gave, she couldn't have possibly met Mr. Taylor between her 18th birthday. So this is a case, situation where the court had let in some really prejudicial evidence and didn't make the required determination that it had been proven by a preponderance, that there was a preponderance of the evidence to support the allegation, and that in and of itself, in addition to all the other improper prior bad acts, should be grounds for reversal, and I'll reserve the rest of my time for rebuttal. Very well. Thank you, Mr. Kushner. Mr. Goldman, on behalf of the government. Good morning, Your Honors, and may it please the Court. Ross Goldman for the United States. I'll start with the challenges to the Sex Act issue, both first with respect to the sufficiency claim and then with respect to the instructional claim. The government's position, as we outlined in our brief, and as the Ninth Circuit held in the Bazaar case,  is that the ordinary and natural meaning of the term happy ending massage, which, as multiple witnesses testified to, they referred to it as a hand job, which they described as manually stimulating the man, usually to the point of ejaculation. A reasonable jury could have concluded that that conduct constituted a sex act, as that term is ordinarily and naturally understood. In this case, though, didn't the judge basically instruct that that, as a matter of law, was? So this would now be different from the sufficiency claim, but I'm happy to address the instructional claim now. The facts in this case were essentially undisputed below, that a happy ending massage equals a hand job, which equals a sex act. Even when there was discussion about this instruction and when Mr. Taylor objected, he didn't object on the ground that there was a factual dispute about any part of that sort of transitive mathematical equation that the all three equal each other. He didn't object that this was taking a factual issue away from the jury. His objection was that the instruction originally proposed, that just simply quoted the statutory language of commercial sex act, was fine and that the additional language was unnecessary. There was no objection below that, to Judge Erickson's question, that this was taking something away from the jury. And I would submit that perhaps the objection was that it's fine is because it was so clear below that a happy ending massage equaled a hand job, equaled a sex act. That's how multiple witnesses understood the term happy ending. So, for example, on page 383 of the trial transcript, this is SN's direct examination. The question from the government is, did you ever perform sex acts during massages at the Spring Street House? Answer, yeah. Question, what happened? Answer, it was just hand jobs. Again, sex act, hand job as being used interchangeably. Multiple witnesses testified to precisely what a happy ending massage was. There was no objection or dispute to that testimony. With one, Mr. Taylor picks up on this one isolated piece of testimony from Morvang. When she said at one point, she described what a happy ending was as customers coming in to jack off. Now, Mr. Taylor reads this piece of testimony as perhaps creating a fact issue about whether a happy ending involved a woman, you know, providing a service to a male client or the male client basically engaging in a solo act of masturbation. On the point you just made about the objection or that there seemed to be agreement at trial, are you saying that the instructional error is subject to plain error review or something else? So we did not make a plain error review argument in our brief. To be candid, perhaps we should have. If this Court wants to decide the case on plain error, it has the authority to do that. We did not advance that argument. Our point in arguing this in the brief was that it was more toward the merits argument of everyone understood these three things to be the same. And that's why the objection to the added language was not that it's wrong, faulty, or directing a verdict, but was simply unnecessary. But like I said, we did not assert plain error. This Court can view it through the lens of plain error if it elects to do that. Let me ask you this. So, you know, I've read the Ninth Circuit case. I think, as I recall, it's unpublished. They picked the two definitions that we could find that are most favorable to the government. There might be a couple of them that are out there that might be equally favorable, but certainly none are more favorable from our survey. And we looked at, you know, 10, 15, 20 dictionaries. I'd say over half of them refer to just sexual intercourse, or about half, anyhow. The other half have slightly broader definitions. What do we do with that? I mean, some of them define sex act as a phrase. Others don't. Sometimes you have to put them together. But it seems to me that there's some uncertainty about whether, in common and ordinary language, sex act means intercourse only or whether it also includes what happened here. What do we do with that? So, a couple of points, Your Honor. I think dictionary definitions are instructive on the ordinary and natural meaning. I do think how individuals commonly talk and think about what a particular term means is equally, if not more, instructive. And, again, multiple witnesses here were perfectly comfortable using the terms happy ending, massage, hand job, and sex act interchangeably. The district court was. Defense counsel was.  This was not a point of dispute. But taking Your Honor's question with respect to dictionary definitions on its own terms. And now, just in Jungers, this Court's decision in Jungers, the Court was looking to ascertain the ordinary and natural meaning of the term obtains in Section 1591. And there, the Court looked favorably to Black's Law Dictionary and the Oxford English Dictionary to help ascertain that meaning. Now, Black's Law Dictionary, from the 11th edition, defines sex act. And it tells you, among other things, to look at the second definition of sexual relations. The second definition of sexual relations describes, says, physical sexual activity that does not necessarily culminate in intercourse. Sexual relations usually involve the touching of another's breast, vagina, penis, or anus. Both persons, the toucher and the person touched, are said to engage in sexual relations. The Oxford English Dictionary defines sex act to mean a sexual action or activity, especially the act of sexual intercourse. And so I think at least the two dictionary definitions that this Court looked to in Jungers, I think, comfortably encompass the conduct at issue in this case. As does the word any. There was some discussion about what work the word any does before any sex in any of the phrase any sex act in Section 1591. This Court and the Supreme Court have both recognized that the term any is a term of expansiveness and breadth. But it doesn't expand whatever it's modifying. And what I mean by that is if sex act means sexual intercourse, then adding any in front of it just means any act of sexual intercourse. So it doesn't – it means it's to the far ends of whatever the word means, but it doesn't necessarily expand it beyond its bounds. Of course. Of course, the phrase any sexual intercourse would not be – I don't believe that would be a customary way of – Congress would have just said sexual intercourse. I mean, sexual intercourse is one thing. There's almost no work that the word any would do before sexual intercourse if Congress meant sex act to only mean sexual intercourse. And I think the contrast with Section 2246d is instructive in this regard, where Congress there did define the universe of what the term sexual act meant. Now, as the Court noted in my friend's presentation, the introductory language to 2246 makes clear that the definitions apply to that chapter. That chapter is Chapter 109A. 1591 is a Chapter 77 offense. That's one textual hook, and I would suggest a strong textual hook that Congress did not intend those definitions to apply. The other point I want to make is a timing point. The definitions in 2246a through 2, a through d, were enacted into law before Section 1591, which was enacted in 2000. The other definitions were enacted in 19 – I believe, 84 – 86 and 94. Had Congress intended for the term any sex act in 1591 to mean the same thing as sexual act in 2246, presumably Congress would have just said that or would have done what it did in 2423f and would have just incorporated that definition. Now, 2423f is also, I think, highly instructive in this regard because there the statute in a definitional provision references in separate subsections the definition of sexual act in 2246, too, and then separately the definition of any sex act in 1591. And so there are a number of textual hooks for the argument that sex act, any sex act, has to be broader than what's set forth in Section 2246, too. You know, this is kind of weird because I'm hung up back where you're at when you're talking about the witnesses all testified and they understood happy endings to fall within the definition of sex act. And I'm thinking about what we do in a contract context and we say people who are engaged in a business or trade who use terms of art within the trade and have an understanding. Is that really the argument that you're advancing? Something like because all these people when you say what's a sex act and they say or did you perform any sex acts, they say yes, then they say happy endings, and that that kind of indicates that within the trade that's a common understanding and parlance? I certainly would understand that argument in a contract context. S.N. and A.L., they were victims in this case. They certainly were engaged in this business. I don't know that I would call them experts on the trade. I mean, they were young women. A.L. was not. She was over 18. They were young women who had no experience in this industry before. They were trained by Mr. Taylor. They did only a couple. A.L. only did the one happy ending. So then why do we care what their understanding was? Because it really sheds little light on the interpretation of the statute. Well, I think we would care as part of a universe of considerations that this court would apply to ascertain what is the ordinary and natural meaning, what individuals think a term means. And this is not, you know, if this was a highly technical scientific kind of environment where we're talking about terms that are not to the general public, I think that Your Honor's point would have a lot of salience. In this context where I would submit we're talking about something that's more accessible to more people that was not disputed, again, it's not even as though defense counsel disputed the proposition that happy endings equaled handjobs, which equaled sex acts. I do want to say one point on the vagueness point because there were some questions about line drawing. This Court made clear, and Paul, the Supreme Court, has made clear that for a vagueness challenge like this to succeed, the defendant has to show that the statute is vague as to his conduct. So it does him no good to imagine a hypothetical case of a 1591 prosecution predicated on a kiss or a touch or something like that. There's no doubt that the further you get away from what I would submit are sort of quintessential sex acts, there might be more difficult line drawing questions. That does not aid him in this case because his conduct in this case, as we argue in our brief, falls in our view comfortably within the Ordinary and Natural Meaning of Sex Act. And certainly when you overlay the sufficiency standard on top of that, certainly we would submit it's the case that any reasonable jury could have found on this record that the Ordinary and Natural Meaning of Sex Act includes the happy ending massages. Suppose there was a, I'm just trying to figure, this line drawing problem is interesting to me. Suppose there was a towel in between. So there was still the same act except for through a towel. And the client still got sexual satisfaction out of it. Is that any sex act or is that not any sex act? I think we would take the position that it is any sex act. That that would be any sex act. That's right. But, again, that's a good example of a case that's slightly further removed from, I think, what we have in this case. Mr. Goldman, I'm concerned about the sufficiency of the evidence on Count 4 with respect to A.L. and fraud, coercion. What's your response to that argument? So A.L. testified that she spoke with Mr. Taylor about his massage visits before she started working for him. And she also testified that when she started doing these massages, she had no expectation that this was anything other than her giving regular traditional massages, and that she did not expect to be doing happy ending massages. She did not want to be doing happy ending massages. And I think the most logical inference here, and we have citations for this in the brief, is that in some respects Mr. Taylor led her to believe that this — rather than a fraud that caused her to engage in a sex act. Well, I don't think so, Your Honor, because what she — what the fraud was here was basically making — not making her think that everything was going to be on the up and up. When, as he was — when, as he well knew, so the jury could have inferred, there was going to be an expectation on the part of clients that there would be happy endings at the end of A.L.'s massages, and that A.L. would be forced to provide those happy ending massages. And, indeed, that is precisely what happened in this case. A.L. testified — But there was no evident — well, correct me if I'm wrong, but A.L. didn't testify that Mr. Taylor told her to engage in the sex act. Well, that is correct. And, in fact, she only did it one time, right? She — well, that is also correct. Of course, she didn't have to do it any times for the statute to apply, because the statute's written in the future tense that forced fraud and coercion will be used to cause a victim to engage in a commercial sex act. The fact that she actually was forced to do it in this case, I think, is proof. Well, what am I missing? Because, in my mind, the fraud you assert, potentially legitimate fraud, is a fraud that causes her to join his operation, but not necessarily engage in a sex act. And if I read the statute right, the fraud has to cause her to engage in a sex act. I'm just — through fraud — that fraud will be used to cause the person to — forced fraud and coercion will be used to cause the person to engage in a commercial sex act. Okay. Right. So, as I understand the fraud you're describing, you know, I have a legitimate business, nope. That causes her to join the business as a masseuse, but I don't quite see how that causes her to engage in a sex act, which is what the statute requires. I think, Your Honor, because the initial deception about the nature of the business and the nature of a client's expectations gets coupled with — and, again, this is on sufficiency review. So part of what I'm articulating here is what I think are reasonable inferences the jury could have drawn from the universe of the evidence in this case. But that he defrauded her with respect to the nature of the business and the expectations of the clients and then sort of banked on the idea that clients were going to force her to do these things, that they were going to force her to give the happy ending massages that he had made her believe she was not going to be required to do. So they get coupled in that respect. And that's precisely what happened. A.L. tested — It would be forced by the customer, not by Mr. Taylor. Well, the statute doesn't require that Mr. Taylor himself use force. The statute requires that he, you know, entice, harbor, advertise, et cetera, knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, will be used to cause the person to engage in a commercial sex act. And so the statute does not, by its terms, require proof that the defendant himself used the fraud. The defendant used — excuse me, used the force. The defendant defrauded her to get her in the door, into the business, knowing, so the jury could have inferred, that clients were going to be expecting these happy ending massages. And the jury could have inferred that from a number of sources of testimony. One is the prices that Mr. Taylor directed the women to charge. There's testimony that those prices connote the idea or bring with them the idea that there is going to be a happy ending at the end of this massage. He was — Mr. Taylor's counsel said that there's no evidence in the record of the back page ads. That's not right. Government Exhibits 37 and 38 are the back page ads that — are two back page ads that Mr. Taylor posted. And, you know, it's true that she didn't see those ads, but that's part of the fraud. She went — the customers were trying to touch A.L. repeatedly, and she didn't want that. And she went to Mr. Taylor and said, what are you putting in these ads that's making these clients think that they can fondle me and touch me? And he said, oh, no, it's not that. There's nothing in the ads. No one's coming in for anything except a regular massage. And so that's the — that's the sufficiency argument. It's coupling the initial deception and then banking on clients forcing her to do these sex acts, which ultimately goes to his financial benefit because he's directing them to charge — Two questions. Yes. Were the clients — there was evidence that the clients used force? That's one. And the second one, what's in the ads that would have led the clients to believe? So there is evidence on the first question. A.L. testified that a client wanted her to give her a handjob, and she didn't want to do it. And then she said that he was acting forcefully and aggressively, and she then muttered under her breath, I'm going to hell, and then gave the handjob. So that would be the evidence that the client used force. The ads, I have — if I can have just one moment to pull them up, because it is Government's Exhibit 37 and 38. So one of the ads — now, the ads did not picture — A.L. was a picture of a woman they photographed on the Internet, but it was one of the ads. This is Government Exhibit 37. It read — it showed some sort of suggestive pictures of a woman, and it read, Let my soft hands do the job for you. I'll relax. I'm fun, sweet, talkative. I'll blow your mind away. So that was the content of that ad, which, again, is a — the jury could have looked at this as an ad that is sexually suggestive in nature, and the jury does not have to ignore the universe of other evidence in this case from other witnesses about Mr. Taylor's knowledge of what's going on. You know, there was testimony in the record when one customer complained about a massage and specifically complained that there was no happy ending at the end. Mr. Taylor wrote back and said, you know, come back. You know, next time we'll be better. We don't do full service, but you will release. I mean, Mr. Taylor knows in his orchestrating that — yes, Your Honor, I'm sorry. No, I was just thinking, you know, the statute itself talks about advertising in reckless disregard of the fact that someone may be coerced or forced, you know, and, you know, the advertising language itself is sufficient to demonstrate that sort of reckless disregard that the customer will engage in forceful conduct that leads to it. I think that's right, Your Honor, as is the — I mean, he enticed her by offering to — by giving her — you know, helping her earn money through this work. He certainly advertised her. He transported her to the Spring Street house in order for her to be able to do these massages for his business. So I think — and I don't take Mr. Taylor to be challenging the sufficiency of evidence on the enticing harboring advertising component of the 1591 prosecution. I only have — What's the nature of Backpage? Does that help your case? And the reason why I ask that is there's some suggestion in the record that Backpage is used only for sort of sexual prostitution purposes and things like that. I don't know if that's true or not. My understanding is it's no longer there. But if it was, then is merely advertising on Backpage enough to show that he — that Taylor intended for all these sex acts to take place? So I don't know. I mean, it is certainly the case that Backpage was used extensively for these sort of sexual kinds of ads. I don't know that there's record evidence that this was exclusively what it was used for. I do think it helps, though, because, again, the statute does not criminalize all massage businesses that provide happy ending massages. The statute, 1591, does not reach, for example, adult workers who are doing these happy endings without there being forced fraud or coercion. And so the way in which Mr. Taylor is using the statute — excuse me, using Backpage is, I think, relevant in particular to show that he knew what was going on in his business and that he was trying to get clients who were going to expect happy ending massages. In fact, one client told A.L. when she did not want to do the handjob, the client said, well, why would you work in a place like this if you didn't want to do that? I'm not stupid and you're not either. Like, this is what he was — the Backpage is what he was trying to do. I'm out of time, but I have not — I haven't addressed the other claims. I'm happy to address those claims, the arguments that my friend made on the other side, or I can just rest in our briefs, but I don't want to go over time. I think unless there's any questions, I think your time has expired. Okay. Thank you, Mr. Goldman. Thank you, Your Honor. Don't worry. Thank you. I just took a clear — I can't find anything in the transcripts that ties Exhibits 37 and 38 to A.L. It looks like they were part of a large pile of exhibits of ads that were introduced to the government agents, and I couldn't find any specific testimony indicating that those were the ads for A.L. So the bottom line is we don't know, based on the record, what ads Mr. Taylor placed for A.L. and whether they were subjective or indicated, you know, led to some expectation of sex or not, and that's where the evidence falls short. Does that matter, though? I mean, if you have the business advertising, even other women, to do this, does that somehow give enough for a reasonable jury to say, well, you know what, you're putting her in a position where you told her it wasn't going to happen, but then you're advertising for these sex acts, and let's just assume they're sex acts, on Backpage, which by itself is a website that is used for these purposes. Well, we don't know what he was advertising for on Backpage with respect to this particular person, so that's what the problem is. They could have been legitimate massages, they could have been sexual, they could have been ambiguous, and, you know, this talk about what do you expect to happen, well, I mean, I guess anyone kind of knows that this kind of stuff can happen to massage parlors, whether the masseuse intends it or not, you know. I mean, it's a place that's going to attract perverted people, and, you know, that's not something that Mr. Taylor has control over, and the fact that it happened. Is there any evidence that the ads were run during the time that A.L. worked there? I don't know. I'm not sure. I can't tell you offhand. There were a lot of exhibits with ads, and I can't tell you if there was anything to indicate those ads were with respect to her, but they had, you know, they guessed that certain ads were identified with certain people and phone numbers, and so we don't know, and I think that's the problem. Now, going back to the jury instruction, I think this is a really critical point because the prosecutor is suggesting that there should be some kind of plain error view because he's claiming that the defense attorney didn't object to happy ending being considered a commercial sex act, and, you know, I think it's clear in the record that the defense attorney objected to the instruction that a happy ending massage is a commercial sex act. He said that the statutory language is fine and that we should stick with that, and that's consistent with the position that, you know, a happy ending massage shouldn't be defined as a commercial sex act. You know, could the defense attorney have been more vigorous and explanatory and done some more careful research on it? Sure, but for purposes of the record, he preserved the objection, and I think the court needs to look at this, you know, based on the abusive discretion standard for the court and instructing as to what a happy ending massage meant. And, you know, what the jury and whether it was a proper jury instruction, I think for the reasons we've gone over, it's telling the jury to conclude too much. It goes way beyond what the statute is, and there needs to be legally supportable explanations to the jury. And I think as to what constitutes a sex act, I think the point is that there are different ways someone can interpret it, and so a lot of people could decide that a hand job is a sex act, and other people might be more technical about it and say, well, you know, it isn't. You know, as well as intercourse, a lot of dictionaries define it that way, and a lot of statutes wouldn't define this as a sex act. And we shouldn't be in a position of imputing to Mr. Taylor what various people's understanding might be when there's ample grounds for people to conclude in both directions, even if it's 60-40 or 70-30 in one way, you know, in one direction, say against us in terms of how people might define sex act. It's still sufficiently ambiguous so that it doesn't provide sufficient notice to hold someone criminally liable. Thank you very much. Thank you, Mr. Kushner. We appreciate your accepting the appointment under the Criminal Justice Act as well. Thank you. Very well. The case will be submitted. We appreciate your appearance live and your arguments today.